IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| HENRY WATKINS SKINNER, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>LYNN SWITZER, District Attorney )<br>for the 31st Judicial District )<br>of Texas, )<br>)<br>Defendant. ) | Civil Action No. 2:09-CV-_____ |

## COMPLAINT

1. Plaintiff Henry Watkins Skinner is scheduled to be executed by the State of Texas on February 24, 2010. The State intends to carry out this sentence in spite of the fact that there is a substantial amount of DNA evidence that has never been tested and could prove Plaintiff's innocence. This suit is brought to enjoin Defendant Lynn Switzer, the District Attorney for Gray County, Texas, from violating Plaintiff's federal constitutional rights by denying him access to that evidence for purposes of forensic DNA testing.

2. Defendant's refusal to release the biological evidence for testing violates Plaintiff's Fourteenth Amendment right to due process and his Eighth Amendment right to be free from cruel and unusual punishment. Plaintiff requests of this Court an order declaring that Defendant's continued withholding of the evidence violates Plaintiff's constitutional rights and requiring that Defendant release the evidence to Plaintiff under a reasonable protocol regarding chain of custody and preservation of the evidence, in order that Plaintiff can have the evidence tested at his own expense.

**COMPLAINT**

## I.   JURISDICTION

3.   This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 1651, 2201, and 2202, and under 42 U.S.C. § 1983.

## II.   VENUE

4.   Venue lies in this Court under 28 U.S.C. § 1391 because the Defendant resides in the Northern District of Texas.

## III.   PARTIES

5.   Plaintiff is currently incarcerated, under a sentence of death imposed by the 31st Judicial District Court of Texas (the "31st District Court"), at the Polunsky Unit of the Texas Department of Criminal Justice in Livingston, Texas.  He is scheduled to be executed on February 24, 2010.

6.   Defendant Lynn Switzer is the District Attorney for the 31st Judicial District of Texas, and maintains an office in that district in the city of Pampa.  She is being sued in her official capacity.  Defendant Switzer has custody and control of the DNA evidence that is the subject of this case.

## IV.   PROCEDURAL BACKGROUND

7.   In 1995, Plaintiff was convicted and sentenced to death by a jury in the 31st District Court for the murders of his girlfriend Twila Busby and her sons Elwin Caler and Randy Busby.  The conviction and sentence were upheld by the Texas Court of Criminal Appeals ("CCA") on direct appeal.  *Skinner v. State,* 956 S.W.2d 532 (Tex. Crim. App. 1997), *cert. denied,* 523 U.S. 1079 (1998).

8. On March 26, 1998, Plaintiff initiated state court habeas corpus proceedings pursuant to Art. 11.071 V.A.C.C.P. Plaintiff's efforts to obtain post-conviction relief from the state courts were ultimately dismissed on procedural grounds.

9. Plaintiff filed a petition for writ of habeas corpus with this Court on February 4, 1999. That petition was ultimately denied on February 22, 2007. *Skinner v. Quarterman*, No. 2:99-CV-0045, 2007 WL 582808 (N.D. Tex. Feb. 22, 2007) (not designated for publication). On May 14, 2008, the United States Court of Appeals for the Fifth Circuit granted a certificate of appealability on two issues relating to Plaintiff's claim that he was denied effective assistance of counsel at the guilt phase of his trial. *Skinner v. Quarterman*, 528 F.3d 336 (5th Cir. 2008). However, after receiving additional briefing, the Fifth Circuit on July 14, 2009 affirmed this Court's denial of the writ of habeas corpus. *Skinner v. Quarterman*, 576 F.3d 214 (5th Cir. 2009). On November 25, 2009, Plaintiff filed a petition for a writ of certiorari with the Supreme Court of the United States, seeking review of the Fifth Circuit's judgment. A ruling on that petition is pending.

10. On October 20, 2009, without giving Plaintiff's attorneys any notice or an opportunity to be heard, the 31st District Court entered an order directing that Plaintiff be executed by intravenous injection "at any time after the hour of 6:00 p.m. on the 24th day of February, 2010."

### V.    DNA TESTING PERFORMED BY THE STATE

11. The evidence presented at trial showed that Twila Busby was strangled by her assailant and then beaten repeatedly with an ax handle found at the scene, that Elwin Caler received multiple stab wounds to his chest, and that Randy Busby was stabbed repeatedly in the back. The evidence also showed that at some point around the time of the murders, Plaintiff sustained a cut to his hand. As a result of these multiple injuries, copious blood stains and other

**COMPLAINT**

3

biological evidence were found by the police throughout the house in which the murders occurred.

12. The State chose to conduct DNA testing prior to trial on only four items. At trial, the State's DNA expert testified that swaths cut from Plaintiff's shirt contained both Twila Busby's and Plaintiff's blood and swaths cut from the pants contained blood from Twila Busby, Elwin Caler and Plaintiff. She also testified that the blood on the blanket was that of Randy Busby, the hair on his body was also his, and the hair on the blanket belonged to Elwin Caler. These results tend to show that Plaintiff came in contact with Twila Busby and Elwin Caler after they were injured. They do not indicate how that contact occurred and do not show that Plaintiff inflicted their injuries.

13. No evidence submitted at trial proved conclusively that Plaintiff committed the murders. His conviction was based primarily on the circumstantial evidence that Plaintiff was present in the house at the time the murders occurred, that he had the blood of two of the victims on his clothes, and that he supposedly told a neighbor, Andrea Reed, shortly after the murders that he might have "kicked" Twila Busby to death. There was no evidence, however, that Twila Busby was in fact kicked. The defense presented expert testimony that Plaintiff was too incapacitated from having consumed large quantities of alcohol and codeine, and had insufficient use of his right hand due to a prior injury, to have committed the crimes. The defense also asserted that the State, which had the burden of proof, had failed to test all of the evidence and had failed to investigate an alternative suspect, Twila Busby's uncle Robert Donnell. The evidence showed that Donnell had stalked Twila Busby at a New Year's Eve party shortly before the murders, and his whereabouts at the time of the murders were never explained.

14.   In 2000, former District Attorney John Mann, responding to questions raised in the media regarding Plaintiff's possible innocence, decided to have additional DNA material tested. Ignoring repeated requests by Plaintiff's post-conviction counsel to participate in the testing process to insure its validity, Mann unilaterally arranged for GeneScreen, a private laboratory in Dallas, Texas, to test certain additional items selected by Mann. Once again, the items selected did not include all the available DNA evidence.

15.   GeneScreen reported its results to the District Attorney in four separate reports. The first, dated August 24, 2000, reported as follows:

> Twila Busby is included as a contributor of the profile obtained from the blood on the cover of the blue notebook, the hair from the back of Twila Busby, the hair from the left hand of Twila Busby, and the hair from the ax handle. Henry Watkins Skinner is included as a contributor to the profile from the cigarette butt. Twila Busby and Henry Watkins Skinner are included as contributors to the mixed profile from the hair from the right hand of Twila Busby. The profile from the gauze with bloodstain is from an unknown male individual. The profile of the cassette tape with blood is a mixture of two unknown individuals. No conclusion could be reached concerning the hair from the living room, the hair from the abdomen of Twila Busby, the hair from the cassette tape, and the hair from the back bedroom door.

16.   The second GeneScreen report, dated September 20, 2000, solely addressed additional testing performed on blood flakes on the hair found in Twila Busby's right hand. It concluded that Twila Busby herself was the contributor of that blood.

17.   The third GeneScreen report, dated October 4, 2000, was identical to the first report except that it added an additional paragraph describing the likelihood that the mixed profile of the DNA found on the hair from Twila Busby's right hand was from Twila and Plaintiff, as opposed to the possibility that someone other than Plaintiff was the second contributor.

**COMPLAINT**

18. Because the GeneScreen testing performed up to this point had been incapable of determining the source of the hair shafts themselves, John Mann asked GeneScreen to subject those hairs to mitochondrial testing, a form of analysis that examines the mitochondria within the cells of the hair shaft. The fourth and final GeneScreen report, dated February 6, 2001 – after Mann had left office – contradicted Mann's assertion that the hairs themselves came from Plaintiff. Specifically, the final GeneScreen report reached the following conclusions:

> Based on the results of this testing, the mitochondrial DNA (mtDNA) sequence obtained from the #1 hair from the victim's right hand, hair samples from T. Busby, the #5 hair from the paper towel around the cassette tape, the #1 hair on the tape found on back bedroom door and the #2 hair on the tape found on back bedroom door are consistent with the profile from the known blood sample from the victim Twila Busby. Neither Twila Busby nor a maternal relative of Twila Busby can be excluded as the potential contributor of these hairs. This profile is unique in the FBI database of 4052 individuals.
>
> Henry Watkins Skinner is excluded as a potential contributor to these hairs. The profile from the hair from the living room and the #2 hair from the victim's right hand was inconclusive.

Robert Donnell, the brother of Twila Busby's mother, was a "maternal relative" of Twila Busby.

19. The GeneScreen testing raised more questions than it answered. For example, while the August 24, 2000 and the October 4, 2000 reports conclude that Twila Busby and Plaintiff were both contributors to a "mixed genetic profile" taken from a hair in Twila Busby's right hand, they also indicate that the markers found in this material matching Twila's DNA profile were strong but those matching Plaintiff's were "faint." In neither of these two reports was the nature of the material found on the hair disclosed, but apparently it was not blood because, in the September 20, 2000, GeneScreen indicated that "blood flakes" taken from this same hair came solely from Twila Busby and that the genetic markers in these blood flakes were *inconsistent* with Plaintiff's DNA. And the February 6, 2001, report concluded that *one* of the hairs found in Twila's right hand was her own, and test results on a *second* hair found in her

**COMPLAINT**

6

hand were inconclusive. The February 6 report is the first to indicate that more than one hair was found in Twila's right hand, but is silent on whether either of the hairs tested mitochondrially was the same as the hair from which DNA material had been obtained for the testing reported on in the earlier reports.

20. GeneScreen did not test all the DNA material Mann sent to have tested. For example, although GeneScreen was provided with the "Dalchem" rape kit specifically used to collect DNA material from Twila Busby's vagina during her autopsy, no results from any DNA testing of the vaginal swabs appears in GeneScreen's reports. Similarly, GeneScreen was provided with Twila Busby's fingernail clippings, but no test results from this material appear in the reports.

21. GeneScreen was *not* provided with several additional items that could yield important results. For example, Mann sent to GeneScreen known DNA samples from only Twila Busby and Plaintiff. No comparison was made to the known DNA of the other two victims, Randy Busby and Elwin Caler, or to the DNA of other possible suspects. Nor was GeneScreen provided the two knives found at the scene (one or both of which were almost surely used to stab Elwin Caler and Randy Busby). Nor was GeneScreen provided a bloody dish towel and a man's jacket containing hairs, blood and perspiration, both of which were found near Twila Busby's body.

## VI. PLAINTIFF'S EFFORTS TO OBTAIN DNA TESTING

Plaintiff has attempted on numerous occasions to obtain testing of DNA material and in each instance was refused relief. The first of those attempts was in 2000, when Plaintiff's counsel asked District Attorney Mann for the opportunity to participate on a joint basis with the testing that Mann unilaterally initiated with GeneScreen. In early 2001, Mann's successor,

**COMPLAINT**

Richard Roach, met with Plaintiff's counsel to consider voluntary testing of the remaining DNA evidence but ultimately declined the request.

22. In 2001, the Texas legislature amended Art. 64 of the Texas Code of Criminal Procedure to provide a procedure for Texas inmates to obtain post-conviction DNA testing. Shortly after that law took effect, on October 9, 2001, Plaintiff filed a motion (the "First Motion") with the 31st District Court asking for DNA testing of the following items:

1) vaginal swabs from Twila Busby contained in the Dalchem rape kit,

2) Twila Busby's fingernail clippings,

3) any biological material on a knife found on the front porch of Twila Busby's house,

4) any biological material on a knife found in a plastic bag in the living room,

5) any biological material on the dish towel, and

6) the blood and hairs on the jacket found next to Ms. Busby's body.

23. The First Motion was ultimately denied by the 31st District Court, and Plaintiff appealed to the CCA. On September 10, 2003, the CCA issued a decision affirming the lower court on the ground that Plaintiff had failed to satisfy the requirements of Art. 64.03(a)(2)(A), which required that the convicted person establish by a preponderance of the evidence a reasonable probability that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA testing. The court concluded that the GeneScreen results were so inculpatory that they could never be overcome by exculpatory results on the items Plaintiff asked to have tested:

> Analysis of blood flakes found on a piece of hair collected from Busby's right hand during the autopsy tested positive for a contribution of the appellant's DNA and Busby's DNA. This analysis demonstrates the intermingling of the

**COMPLAINT**

8

victim's and the appellant's DNA *during the time when she was struggling for her life*. Because the appellant's DNA was found mixed with Busby's DNA in her hand during the autopsy, there is nothing about the other items found at the crime scene that, if linked to a third person, would cast doubt on the appellant's presence at the scene of Busby's death or the appellant's involvement in the offense. Given this evidence, the presence of a third party's DNA at the crime scene would not constitute affirmative evidence of innocence.

24.   On September 25, 2003, Plaintiff moved for rehearing of this decision, on three grounds: (1) the Court was wrong in concluding that the blood flakes on the hair in Twila Busby's right hand were a mixed profile; (2) the Court was wrong in concluding that, *a fortiori*, the intermingling had occurred "during the time [Twila] was struggling for her life"; and (3) the Court was wrong in relying on the GeneScreen reports at all, because they had never been subjected to scrutiny in an adversarial proceeding or accepted as reliable under Texas Rules of Evidence 705(b) and (c).

25.   On December 10, 2003, the CCA issued a new opinion that was identical to its September 10, 2003, opinion except for the paragraph regarding the GeneScreen test results quoted above. In the revised opinion, that paragraph was changed to read as follows:

> The GeneScreen reports indicate that Twila and the appellant "are included as contributors to the mixed profile from the hair from the right hand of Twila Busby." This analysis demonstrates the intermingling of the victim's and the appellant's DNA, *probably* during the time when she was struggling for her life. Because the appellant's DNA was found mixed with Busby's DNA in her right hand during the autopsy, there is nothing about the other items found at the crime scene that, if linked to a third person, would cast doubt on the appellant's presence at the scene of Busby's death or the appellant's involvement in the offense. Given this evidence *and the other evidence detailed above*, the presence of a third party's DNA at the crime scene would not constitute affirmative evidence of innocence.

*Skinner v. State*, 122 S.W.3d 808, 811 (Tex. Crim. App. 2003) (emphasis added). The revised opinion ignored Plaintiff's objection to reliance on the GeneScreen reports at all, given that they had never been subjected to scrutiny in the adversarial process.

**COMPLAINT**

9

26. Plaintiff's next effort to obtain DNA testing was in this Court, in connection with his federal habeas petition. Plaintiff filed a motion contending that DNA testing was necessary in order for Plaintiff to prove that he had been prejudiced by his counsel's failure to ask for the testing prior to trial. On May 18, 2004, Magistrate Judge Averitte granted production of GeneScreen documents relating to its 2000-01 testing but, without explanation, denied the request for further testing. On August 15, 2005, after reviewing the GeneScreen documents and consulting with his own DNA experts, Plaintiff renewed his motion for DNA testing. On October 4, 2005, Magistrate Judge Averitte again denied the request but left open the possibility that Plaintiff could "reurge" the motion if Plaintiff were able to demonstrate at the November 2005 evidentiary hearing that trial counsel had been deficient in failing to seek DNA testing prior to trial.

27. At the November 2005 evidentiary hearing in the habeas case, Magistrate Judge Averitte allowed the parties to submit evidence limited to GeneScreen's conclusion, in its February 6, 2001 report, that the results of the mitochondrial testing of the second of the hairs clutched in Twila Busby's right hand were "inconclusive." Plaintiff's expert testified that the results of the testing on the second hair, while inconclusive in the sense that they could not be used to identify a particular person as the source of that hair, were nevertheless sufficient to determine that Twila Busby could conclusively be excluded as the source of the second hair and that Plaintiff more likely than not could be excluded. The State's witness, who had performed the mitochondrial DNA testing on that hair while employed at GeneScreen in 2000-01, defended his decision to report the results as inconclusive. This Court ultimately did not resolve the dispute between the experts on this point, or rule on Plaintiff's motion for further DNA testing,

because it concluded that trial counsel had not performed deficiently in failing to request DNA testing.

28. On July 30, 2007, Plaintiff filed a second motion for DNA testing (the "Second Motion") with the 31st District Court, citing certain new developments since the CCA's decision on the First Motion that warranted a different result. Shortly after the Second Motion was filed, Plaintiff's counsel telephoned Defendant Switzer, who by then had succeeded Roach as District Attorney, and requested that she voluntarily provide the requested DNA evidence for testing, pursuant to a protocol for handling the evidence to which the parties would agree. Defendant denied that request.

29. Art. 64.02(a)(2) requires that, when a motion for DNA testing is filed, the attorney representing the State either (A) deliver the evidence sought to be tested to the court, along with a description of the condition of the evidence, or (B) explain in writing why the State cannot deliver the evidence. Defendant Switzer, who represented the State in connection with the Second Motion, informed the court that, "[t]o the best of the State's information, knowledge and belief, the items sought to be tested are still available for testing, the chain of custody is intact, and the items are in a condition to be tested although the State has not sought expert opinion in that regard."

30. On December 7, 2007, the 31st District Court denied the Second Motion On appeal, the CCA affirmed, relying only on the ground that Plaintiff had failed to meet the "no-fault-of-the-convicted-person" requirement of Art. 64.01(b)(1)(B). That section requires a convicted person requesting testing that was available at the time of trial to show that the testing was not previously performed "through no fault of the convicted person, for reasons that are of a nature such that the interests of justice require DNA testing." The CCA interpreted this section

**COMPLAINT**

as barring DNA testing altogether for any convicted person who had declined to seek DNA testing prior to trial as a matter of legal strategy:

> [I]f trial counsel declined to seek testing as a matter of reasonable trial strategy, then post-trial testing would not usually be required by the interests of justice. To hold otherwise would allow defendants to "lie behind the log" by failing to seek testing because of the reasonable fear that the results would be incriminating at trial but then seeking testing after conviction when there is no longer anything to lose.

*Skinner v. State,* 293 S.W.3d 196, 202 (Tex. Crim. App. 2009).

31.   As a result of the decisions of the CCA denying Plaintiff post-conviction DNA testing under Art. 64, the Defendant has refused and continues to refuse to make available to Plaintiff any DNA material for testing. Her most recent refusal was in a telephone conference with Plaintiff's counsel on November 25, 2009.

### VII.   FIRST CLAIM FOR RELIEF – DENIAL OF DUE PROCESS

32.   Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

33.   By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could demonstrate he is not guilty of capital murder, Defendant has deprived Plaintiff of his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence, all in violation of his right to Due Process of Law under the Fourteenth Amendment to the Constitution of the United States.

### VIII.   SECOND CLAIM FOR RELIEF – CRUEL AND UNUSUAL PUNISHMENT

34.   Plaintiff realleges and incorporates herein by reference the allegations contained in all the preceding paragraphs of this Complaint.

35. By refusing to release the biological evidence for testing, and thereby preventing Plaintiff from gaining access to exculpatory evidence that could demonstrate he is not guilty of capital murder, Defendant has deprived Plaintiff of his liberty interests in utilizing state procedures to obtain reversal of his conviction and/or to obtain a pardon or reduction of his sentence, all in violation of his right to be free from Cruel and Unusual Punishment under the Eighth Amendment to the Constitution of the United States.

## IX. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court provide relief as follows:

36. A declaratory judgment that Plaintiff is entitled to access to the following evidence for DNA testing at Plaintiff's expense:

    a. vaginal swabs taken from Twila Busby at the time of her autopsy;

    b. Twila Busby's fingernail clippings;

    c. the knife found on the front porch of the house where the murders occurred;

    d. the knife found in a plastic bag in the living room of said house;

    e. the dish towel also found in said plastic bag;

    f. the windbreaker jacket found on the living room floor; and

    g. any hairs found in Twila Busby's hands.

37. A preliminary and permanent injunction requiring Defendant to produce all the foregoing evidence to Plaintiff, pursuant to an appropriate protocol regarding chain of custody and preservation and return of the evidence.

38. Reasonable attorneys' fees, costs of suit and such other and further relief as this Court deems just and proper.

Respectfully submitted,

*[signature]*

ROBERT C. OWEN*
Texas Bar No. 15371950
Owen & Rountree, L.L.P.
P.O. Box 40428
Austin, Texas 78704
Phone: (512) 804-2661
Fax: (512) 804-2685
robowenlaw@gmail.com

\*   Member of the Bar of the N.D. Tex.
    (motion to proceed without
    designation of local counsel pending)

DOUGLAS G. ROBINSON†
D.C. Bar No. 10850
1440 New York Avenue, N.W.
Washington, DC 20005-2111
Phone: (202) 371-7800
Fax: (202) 371-7168
douglas.robinson@skadden.com

MARIA CRUZ MELENDEZ†
N.Y. Bar No. 4528378
Four Times Square
New York, NY 10036-6522
Phone: (212) 735-2435
Fax: (212) 735-2000
maria.cruzmelendez@skadden.com

†   Pending admission *pro hac vice*

*Counsel for Plaintiff*

Dated: November 27, 2009

**COMPLAINT**

882308.03-D.C. Server 2A - MSW